NOT FOR PUBLICATION                          [Dkt. Ent. 8]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| YOWIE NORTH AMERICA, INC., et al., | Civil Action No. 14-1409 (RMB/KMW) |
| Plaintiffs, | |
| v. | REDACTED OPINION |
| CANDY TREASURE, LLC, | |
| Defendant. | |

Appearances

Kevin N. Ainsworth
Elizabeth Gene Greenberg
Mintz Levin Cohn Ferris Glovsky & Popeo PC
666 Third Avenue
New York, New York 10017
     Attorneys for Plaintiffs

Victor A. Deutch
Deutch & Associates, LLC
843 Rahway Avenue
Suite 202
Woodbridge, New Jersey 07095
     Attorney for Defendants

Robert P. Greenspoon
Michael R. LaPorte
Flachsbart & Greenspoon, LLC
333 N. Michigan Ave., 27th Floor
Chicago, Illinois 60601
     Of Counsel for Defendants

BUMB, United States District Judge:

This matter comes before the Court upon a motion for a

preliminary injunction filed by Plaintiffs Yowie North America,

1

Inc. ("Yowie") and Henry M. Whetstone, Jr. ("Whetstone") (collectively, the "Plaintiffs"), seeking to enjoin Defendant Candy Treasure, LLC ("Candy Treasure") from marketing, distributing, offering to sell or selling their allegedly infringing Choco Treasure "surprise" products.  (Dkt. Ent. 8.) On April 2 and 3, 2014, this Court held a hearing on Plaintiffs' motion and, subsequently, permitted the parties to submit post-hearing memoranda.  For the reasons set forth below, Plaintiffs' motion is DENIED.

## I.   BACKGROUND

Confectionary products that contain little treasures, toys, or other inedible products are sold internationally and have been for many years.  However, because many of these products contain an edible surface (usually chocolate) that completely encloses the inedible items beneath, these products can create a choking hazard for children.  In 1938, the United States Food & Drug Administration (the "FDA") effectively banned such items, labeling as "adulterated" any confectionary containing nonnutritive substances wholly or partially embedded therein (with some exceptions).  21 U.S.C. § 342(d)(1).

Plaintiff Whetstone obtained two patents related to a chocolate inclusion product design that would permit a child to see part of an inedible capsule encased within the edible confection:  U.S. Patent No. 5,925,391, entitled "Edible and

Nonedible Product" (the "'391 Patent"), issued on July 20, 1999; and a continuation-in-part of the '391 Patent, which issued as U.S. Patent No. 6,099,872, entitled "Edible and Non-Edible Product" (the "'872 Patent"), on August 8, 2000.  These patents address "[a] combination edible and non-edible product . . . , which has a housing formed of first and second sections of plastic or other non-edible material interconnected to form a hollow interior adapted to receive a toy or other item."  (Exs. 1 and 2, Am. Compl. at [57].)  These sections of the inedible housing include a rib or flange.  A confectionary layer is formed on top of the inedible housing, but the outer edge of the rib remains visible to the consumer.[1]  (Id.)  Yowie, a "surprise chocolate company" with its principal place of business in Perth, Australia, obtained an exclusive license under the '391 and '872 Patents in mid-2012.  (Pl.'s Ex. 1.)  Yowie also has entered into a co-existence agreement with Kisko through which Yowie has acquired rights to use the "Yowie" trademark in connection with its products.  (See Pl.'s Ex. 7.)

At some point in the summer of 2011, Plaintiff Whetstone learned of the Choco Treasure product, which is manufactured by Defendant Candy Treasure.  He learned about Choco Treasure from

_____

[1] Only the '872 Patent is at issue for purposes of the preliminary injunction request.

an e-mail from a representative of Ferrero, another chocolate confectioner company located in Italy.  (Tr.[2] at 432.)

In September 2011, Whetstone visited the Italian headquarters of Ferrero where he was shown a sample of the Choco Treasure product.  (Id.)  The Choco Treasure products are egg- or ball-shaped candies that contain figurines or puzzles encased in an egg- or ball-shaped plastic housing. The plastic housing includes a rib with a rounded edge that remains visible to the consumer when the foil wrapping is removed.  (See Tr. at 280-81, 294.)  Kevin Gass, CEO of Candy Treasure, testified that Candy Treasure targets consumers aged 3 to 7, and that it produces a seasonal item specifically addressed to candy purchases during the holidays, primarily Easter and Christmas.  (Tr. at 293, 326.)  He further testified that they do not sell items online or in stores from May through September, although a few sales may occur, by third parties on websites like Amazon.com.  (Tr. at 299-300.)

Whetstone testified that after learning about Candy Treasure in the summer of 2011 he undertook efforts to locate Choco Treasure.  On approximately four occasions he tried to call Candy Treasure.  (Tr. at 433.)  He had known Gass, and had sent Gass approximately two e-mails.  (Tr. at 433.)  When he was

---

[2] "Tr." refers to the transcript of the preliminary injunction hearing that took place on April 2 and 3, 2014.

unable to make contact with Gass, Whetstone had his attorney write Candy Treasure a letter.  On August 8, 2011, through his attorney, Plaintiff Whetstone sent a letter to Kevin Gass' attorney advising Gass that Choco Treasure "may infringe one or both of the Whetstone Patents."  (Ex. DX 103.)  Gass, through his attorney, responded that "Candy Treasure sells a significantly different product from that claimed in Mr. Whetstone's patents.  If you obtain a product sample to compare against the patent claims, you will see why."  (Ex. DX 104.)  After the receipt of this letter, Whetstone looked for the Choco Treasure product in stores in Michigan and Florida, as well as trade shows, to no avail.  (Tr. at 433-35.)  He also attempted to order the product online but was informed the product was out of stock or could not be shipped during hot weather.  (Id. at 433-44.)  He finally located the Candy Treasure product at a Target store in March 2013 in St. Augustine, Florida.  As Whetstone testified, the Candy Treasure product is "very spotty and hard to find."  (Id. at 435.)  On June 14, 2013, Yowie's attorney sent a cease and desist letter. (Docket No. 8-20.)

On August 16, 2013, Plaintiffs filed the within lawsuit in the United States District Court for the Southern District of California, and thereafter filed a motion for an injunction, preliminarily enjoining Candy Treasure from marketing or selling its Choco Treasure product.  On February 21, 2014, the lawsuit

was transferred to the District of New Jersey pursuant to 28 U.S.C. § 1404(a), and assigned to this Court on March 7, 2014. (Docket Nos. 52, 54.)  On March 13, 2014, the Court heard oral argument, during which the Court granted the Motion to Dismiss as to defendant Gass, but denied the Motion for Summary Judgment pending the Court's decision on the Motion for Preliminary Injunction.  (Docket No. 69.)  Then, on April 3 and 4, 2014, the Court conducted a hearing on the Motion for Preliminary Injunction.

## II.  ANALYSIS

"[T]he standard for granting or denying a motion for a preliminary injunction is not unique to patent law, and [] the standard of the regional circuit should apply." Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1367 (Fed. Cir. 2008).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 55 U.S. at 20 (citations omitted); see also AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1050 (Fed. Cir. 2010); Titan

Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1375-76
(Fed. Cir. 2009).

Thus, Yowie must show that, "in light of the presumptions
and burdens that will inhere at trial on the merits, (1) [Yowie]
will likely prove that [Choco Treasure] infringes its patent,
and (2) [Yowie's] infringement claim will likely withstand
challenges to the validity and enforceability of the [ ]
patent." AstraZeneca LP v. Apotex, Inc., 623 F. Supp. 2d 579,
587 (D.N.J. 2009) (quoting Amazon.com, Inc. v.
Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001)).

At the outset of the hearing, the Court questioned the
parties regarding the impact on its analysis of a finding of no
irreparable injury.  That is, even assuming a finding of
likelihood of success on the merits, would a finding of no
irreparable injury mandate a denial of injunctive relief.  The
parties appear to agree that a strong showing of a reasonable
likelihood of success does not result in a rebuttable
presumption of irreparable harm.  Although decisions prior to
eBay Inc., et al v. MercExchange, LLC, 547 U.S. 388 (2006),
stood for such a proposition, eBay effectively overruled the use
of the rebuttable presumption and reiterated the traditional
four-factor framework set forth above.  See, e.g., Weeks Marine,
Inc. v. TDM Am., LLC, No. 11-3850, 2011 WL 6217799, at *5
(D.N.J. Dec. 14, 2011) ("Irreparable harm must be established as

a separate element, independent of any showing of likelihood of success; irreparable harm can no longer be presumed." (quoting King Pharms., Inc. v. Sandoz, Inc., No. 08-5974, 2010 WL 1957640 (D.N.J. May 17, 2010))); Millipore Corp. v. W.L. Gore & Assocs., Inc., No. 11-1453, 2011 WL 5513193, at *11 (D.N.J. Nov. 9, 2011) (same); Perfect 10, Inc. v. Google, Inc., No. 10-56316, 653 F.3d 976, 979-81 (9th Cir. 2011) (same). Moreover, "[w]hile the patentee's right to exclude alone cannot justify an injunction, it should not be ignored either." Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1149 (Fed. Cir. 2011).

## A. Likelihood of Success

In order to demonstrate a likelihood of success on the merits, a patentee "must demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001). If the alleged infringer raises a substantial question as to infringement or validity, i.e., "the alleged infringer asserts an infringement or invalidity defense that the patentee has not shown lacks substantial merit," then the Court should not issue the preliminary injunction. AstraZeneca LP, 633 F.3d at 1050

(citing Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997)).

Yowie alleges that Candy Treasure will infringe claims of the '872 Patent by marketing and selling its Choco Treasure product.  Candy Treasure counters that it does not infringe and, in any event, the Patent is invalid.  Specifically, Candy Treasure challenges the validity of the '872 Patent on two grounds: impossibility and obviousness. Candy Treasure also argues the affirmative defense of equitable estoppel.  Before undertaking an infringement analysis, this Court first addresses Defendants invalidity challenges.[3]

### 1. **Validity**

Under 35 U.S.C. § 282, "'a patent is presumed valid, and this presumption exists at every stage of the litigation.'" Sanofi-Synthelabo v. Apotex, 470 F.3d 1368, 1375 (Fed. Cir. 2006)(quoting Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998)).  However, this presumption is not a substantive rule but a procedural device that serves to assign the burden of proof during litigation. D.L. Auld Co. v. Chroma Graphics Corp., 714 F.2d 1144, 1147 n.2 (Fed. Cir. 1983).  As § 282 makes clear, "[t]he burden of

_____

[3] The Court notes that neither party has attempted to define a person of ordinary skill in the art, an important standard in any patent infringement action. As such, the Court will not address it at this stage in the litigation.

establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." Notwithstanding, "in resisting a preliminary injunction, [ ] one need not make out a case of actual invalidity. Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial." Amazon, 239 F.3d at 1359. In other words, "a showing of a substantial question of invalidity requires less proof than the clear and convincing evidence standard to show actual invalidity." Erico Int'l Corp. v. Vutec Corp., 516 F.3d 1350, 1356 (Fed. Cir. 2008) (citing Amazon, 239 F.3d at 1358).

### a. Enablement

Candy Treasure first argues that the Patent is invalid because it contains an impossible limitation. A claimed invention having an impossible claim lacks an enabling disclosure under 35 U.S.C. § 112. EMI Group North America Inc. v. Cypress Semiconductor Corp., 268 F.3d 1342, 1349 (Fed. Cir. 2001). Because the invention must be enabled, and the impossible cannot be enabled, a claim containing a limitation that is impossible to meet may be held invalid under § 112. Raytheon Co. v. Roper Corp., 724 F.2d 951, 956 (Fed. Cir. 1983).

Specifically, Candy Treasure argues that claim 1 of the '872 Patent recites a geometric impossibility because it requires a single flange (rib) to extend in a certain way on

both sides of an imaginary plane.[4]  This is geometrically
impossible, Defendant argues, because this imaginary plane can
only appear in one location if it is to be "perpendicular to
said longitudinal axis," as required by the claim.  That
location is between the two sections of the egg as depicted
below:

.

_____

[4] Claim 1 provides in relevant part:

a housing including a first section and a second
section each formed of a non-edible material, **each of
said first and second sections including an outer
surface, an open end defining a peripheral edge, a
closed end and a longitudinal axis,** said first and
second sections being connectable along said
peripheral edges thereof;

said first and second sections each being formed with
a flange extending along said outer surface thereof
from said peripheral edge to said closed end **on one
side of a plane perpendicular to said longitudinal
axis,** and along said outer surface from said closed
end to said peripheral edge **on the other side of said
plane** . . . .

Col. 8, ll. 6-21 (emphasis added).



**Longitudinal axis**

In other words, the plane perpendicular in the above picture extends infinitely (and simultaneously) straight towards and away from the reader.  According to Defendant, the rib cannot therefore extend from the open end to the closed end of the egg on one side of the plane, and from the closed end to the open end of the egg on the other side of the plane.  Rather, in Defendant's example, the rib extends from the open end to the closed end of the egg on one side of the plane, and from the closed end to the open end of the egg on the **same side** of the imaginary plane.

**Closed End**



**Open End/Plane Perpendicular**                    **Rib**

Defendant's argument, however, is based upon an incorrect premise, _i.e._ that there is only one way to envision the placement of the imaginary plane (in other words, straight towards and away from the reader).  But, if the imaginary plane in Candy Treasure's example were simply shifted 90 degrees, so that it extends to the left and right of the reader, that plane is still perpendicular to the longitudinal axis in a three-dimensional figure.  Only now, the sides of the imaginary plane extend infinitely (and simultaneously) to the left and right (rather than the front and back as in Defendant's hypothetical). In this example, the rib does extend along the outer surface from the open end to the closed end on one side of the plane, and from the closed end to the open end on the other side of the plane.  Candy Treasure's efforts to impose a limitation where none exists are without merit.  Thus, the '872 Patent is not invalid because of an impossible claim limitation.

### b. Obviousness

Candy Treasure next argues that the '872 Patent is invalid because it was obvious in light of the prior art.  Under Section 103(a), a "patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).  In assessing the obviousness of a patented invention, the Court should consider (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the prior art and the claims at issue; and (4) such secondary considerations as commercial success, long felt but unsolved need, and the failure of others. Sciele Pharma Inc. v. Lupin Ltd., 684 F.3d 1253, 1259 (Fed. Cir. 2012) (citing Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966)); see also KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 406 (2007).  Candy Treasure cites four prior art publications that purportedly render the '872 Patent invalid as obvious.  The Court addresses each in turn.

First, Candy Treasure cites to U.S. Patent No. 2,858,955 (the "'955 Patent"), which deals with a "Merchandise Capsule". (Ex. 10, Def.'s Opp., Dkt. Ent. 32-1.)  Specifically, the invention addresses an improved merchandise capsule, commonly

14

used in a vending machine, formed of a pair of complementary sections where the sections can be easily and securely snapped open and closed.  There is nothing about the '955 Patent, however, that discloses a rib between the two sections or a chocolate/edible coating.  Moreover, this publication was cited in the '872 Patent as a prior art reference (Ex. 2, Am. Compl. at [56]), and the Examiner issued the Patent notwithstanding.  See Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1572 (Fed. Cir. 1992) ("Where the PTO has considered a piece of prior art, and issued a patent notwithstanding that prior art, a court owes some deference to the PTO's decision." (citations omitted)).  Cf. Sciele Pharma Inc. v. Lupin Ltd., 684 F.3d 1253, 1260 (Fed. Cir. 2012.

Second, Candy Treasure relies upon Publication No. WO 93/00267, (the "'267 Publication"), which discloses the Kinder Surprise.  (Ex. 11, Def.'s Opp.)  Like Choco Treasure, the Kinder Surprise is a chocolate inclusion product, but, unlike Choco Treasure, it does not have the rib informing the consumer of the presence of a toy beneath the edible exterior.  (Indeed, for this reason, Kinder Surprise products are not permitted to be brought into this country.)  This reference was also considered during prosecution of the Patent.

Third, Candy Treasure relies upon U.S. Patent 4,797,291 (the "291 Patent").  (Ex. 12, Def.'s Opp.)  This '291 Patent

discloses a food product, and method for making a food product, that addresses the low mass-to-volume ratio found in a conventional fortune cookie.  A fortune cookie contains a slip of paper inside a shell-like structure, but there is typically a large amount of empty space around the paper.  The '291 Patent discloses a comestible product with an insert article having less wasted space, thereby facilitating more efficient packaging and storage.

Finally, Candy Treasure cites Australian Patent No. AU706905B (the "Australian Patent"), which discloses a capsule partly or wholly covered by a "foodstuff" that encapsulates a small article like a toy.  (Ex. 13, Def.'s Opp.)  This patent teaches that "[f]or health and safety reasons, it is preferred that any article that is placed inside an item of food be located in a known position and be readily identifiable."  (Id. at 3, ll. 22-24.)

Candy Treasure argues that because there was already a suggestion in the prior art to make inedible parts visible beneath edible parts, e.g., the '291 Patent, there was a motivation to combine the '955 Patent, '267 Publication, and Australian Patent. The Court disagrees.  Each of the prior art publications addressed entirely different and distinct problems. In the case of the '955 Patent, the patent taught a method of making a capsule more suitable for vending machine operations.

16

The '267 Publication did not disclose the revealing rib, and neither the '291 Patent nor the Australian Patent discloses placement of a rib on a capsule, but rather address placement of the article (toy) so that it is visible to the consumer.

In addition to the different teachings of the prior art, Yowie also argues that there was a long felt need to market a fully-encased edible product.  Indeed, since 1938 the FDA had banned confectionary products containing embedded toys because they created a potential choking hazard for young children. Moreover, in 1997, the United States Consumer Product Safety Commission, applying the FDA ban, recalled chocolate products that had entered the country, such as the internationally popular Kinder Surprise egg.  The '872 Patent addressed the need to create a confectionary product containing a toy that would not pose a choking hazard.

Given the above, this Court cannot find that the '872 Patent was obvious in light of the prior art.

### c. Equitable Estoppel

Candy Treasure finally argues that Yowie cannot succeed on the merits because the doctrine of equitable estoppel bars the instant action.  In particular, Candy Treasure contends that Yowie failed to diligently pursue its infringement claims against Candy Treasure after learning of Candy Treasure's

possible infringing activities in August 2011, which resulted in prejudice to Candy Treasure.  The Court disagrees.

Equitable estoppel is an affirmative defense to a patent claim and may bar all relief.  A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1041 (Fed. Cir. 1992).  "[E]quitable estoppel arises when (1) the patent owner through conduct, positive statement, or misleading silence represents to the infringer that his business will be unmolested by claims of infringement, and (2) in reliance on that representation, the infringer continues or expands his business."  6A Chisum on Patents § 1905[3] (citing A.C. Aukerman, 960 F.2d at 1041).  "[T]he accused infringer must establish that it would be materially prejudiced if the patentee is now permitted to proceed. As with laches, the prejudice may be a change of economic position or loss of evidence."  Id.  Even when these elements are satisfied, however, the court must "take into consideration any other evidence and facts respecting the equities of the parties."  A.C. Aukerman, 960 F.2d at 1043.  Notably, a defendant need not show that an unreasonable period of time has passed before the plaintiff filed suit.  See A.C. Aukerman, 960 F.2d at 1041.

On August 8, 2011, Plaintiff Whetstone's attorney contacted Gass, informing him that Plaintiff had "recently become aware of the manufacture and sale of a 'Choco Treasure' product by Candy

Treasure LLC," and believed the product "may infringe one or
both of the Whetstone patents." (DX-103.)  Later that month,
Plaintiff Whetstone's attorney exchanged emails with Gass'
attorney regarding Plaintiff's allegations of infringement.
(DX-104.)  Then, on August 30, 2011, Gass' attorney responded,
"Candy Treasure sells a significantly different product from
that claimed in Mr. Whetstone's patents.  If you obtain a
product sample to compare against the patent claims, you will
see why. . . .  We believe this concludes the matter." (Id.)
Plaintiff Whetstone did not respond.  On June 19, 2013, Yowie's
counsel reached out to Gass, informing him of Yowie's belief
that Choco Treasure infringes the '872 and '391 Patents. (Ex.
5, Def.'s Opp.)  Again, Gass' attorney responded.  That response
expresses Candy Treasure's surprise at the allegations as they
"understood this matter to have been resolved in 2011 after our
final communication with Mr. Whetstone's lawyer in August 2011,
in which [Candy Treasure] noted the fact of noninfringement."
(Id.)  Plaintiffs filed the instant action on August 16, 2013.

Candy Treasure points to Plaintiffs' silence during the
time period between Candy Treasure's August 30, 2011 response
and the initiation of suit in August 2013 as justifying the
application of equitable estoppel.  However, silence or inaction
alone is not enough to create estoppel unless the plaintiff had
a duty to speak or plaintiff's inaction, in combination with

other facts regarding the parties' relationship or contacts,
"give rise to the necessary inference that the claim against the
defendant is abandoned." Id.; ABB Robotics, Inc. v. GMFanuc
Robotics Corp., 52 F.3d 1062, 1064 (Fed. Cir. 1995) ("Misleading
action by the patentee may be silence, if such silence is
accompanied by some other factor indicating that the silence was
sufficiently misleading to amount to bad faith."); see also
Melea Ltd. V. Quality Models Ltd., 345 F. Supp. 2d 743, 753
(E.D. Mich. 2004) ("A plaintiff's silence will not create an
estoppel unless a plaintiff has a clear duty to speak or unless
continued silence will reinforce 'the defendant's inference from
the plaintiff's known acquiescence that the defendant will be
unmolested.'" (citations omitted)).  Misleading silence is
commonly found where there is "an immediate threat of
enforcement followed by silence." ABB Robotics, 52 F.3d at
1064.  No such facts exist here.

      In disputing infringement in 2011, Candy Treasure directed
Plaintiff Whetstone to "obtain" its Choco Treasure product,
which it implied would show that Choco Treasure does not
infringe the patents.  However, Candy Treasure neither included
a sample of its product nor informed Plaintiff where he could
locate and purchase a sample.  Plaintiff Whetstone testified
that, after receiving this letter, he attempted to locate a
Choco Treasure product in the United States but was unable to do

so online or in any store until March 2013.  (Tr. at 433-34,
435-36.)  This is not surprising as Choco Treasure is not sold
either online or in stores, from May through September.[5]  Without
a product, Plaintiff could not verify that Candy Treasure was
infringing the Patents.  And although Whetstone saw the product
while visiting Ferraro's Italian headquarters in September 2011,
this fact alone is not enough to demonstrate that Plaintiffs had
a sufficient opportunity to conduct an infringement analysis.

Moreover, the reasonableness of Candy Treasure's inference
that Plaintiff Whetstone did not intend to assert the Patent
against it after receiving Candy Treasure's August 30, 2011
response is further undermined by the fact that Whetstone's
attorney's letter specifically stated that Whetstone did not
intend to file a patent infringement action at that time.
Rather, Whetstone raised the issue to allow Defendants to
undertake an "investigation," thereby suggesting that Plaintiff
did not possess sufficient information regarding the product
such that he could ascertain whether Defendants were infringing.
(DX 103.)  Thus, contrary to Defendant's suggestion, the Court
does not believe this letter can be interpreted as a threat of

---

[5] Although Gass testified that third-parties may sell online
year-round, there is no testimony that any third-parties were in
fact doing so during the time that Plaintiff Whetstone was
looking.

immediate and vigorous enforcement that, when followed by

silence may give rise to a finding of equitable estoppel.

In sum, the Court does not find that Candy Treasure's

arguments regarding enablement, obviousness, and equitable

estoppel have raised a substantial question as to the Patent's

invalidity.

### 2. Infringement

The Court turns to an analysis of infringement of the '872

Patent.  Yowie and Whetstone claim that Candy Treasure directly

infringes the '872 Patent, specifically Claim 1.  Claim 1

provides:

1. An article, comprising:

    a. Housing including a first section and a second
       section each formed of a non-edible material,
       each of said first and second sections including
       an outer surface, an open end defining a
       peripheral edge, a closed end and a longitudinal
       axis, said first and second sections being
       connectable along said peripheral edges thereof;
       said first and second sections each being formed
       with a flange extending along said outer surface
       thereof from said peripheral edge to said closed
       end on one side of a plane perpendicular to said
       longitudinal axis, and along said outer surface
       from said closed end to said peripheral edge on
       the other side of said plane, said flanges of
       said first and second sections forming a
       substantially continuous rib having opposed side
       edges and an outer edge between said side edges;
       a third section and a fourth section each formed
       of an edible material, said third section being
       carried on portions of said outer surface of said
       first section and said second section, said
       fourth section being carried on portions of said
       outer surface of said first section and said

second section, each of said third and fourth
sections having a peripheral edge which
substantially abuts one of said opposed side
edges of said rib while said outer edge of said
rib is left exposed.

The claim can be broken down into several relevant parts:

i.   An article, comprising: "a housing including a
     first section and a second section each formed of a
     non-edible material."

This element requires that the article have two non-edible

sections, such as plastic.   There is no dispute that this

element is satisfied.   As the following illustration

demonstrates, the Choco-Treasure has two non-edible sections:



(Pl.'s Mot., Dkt. Ent. 8 at 11.)

ii.  Each of said first and second sections including an
     outer surface, an open end defining a peripheral
     edge, a closed end and a longitudinal axis.

This element requires that the above two sections have a

closed end, an open end defining a peripheral edge, and a

longitudinal axis.   The longitudinal axis is an imaginary axis,

23

i.e., a reference axis for the housing, as explained by the
Patent.  It is opposed to the axis running circumferential
across where the two sections meet.  See, e.g., col. 7, ll. 10-
12.

This element is satisfied.  The Choco-Treasure egg clearly
has outer surfaces, closed ends, open ends defining peripheral
edges, and a longitudinal axis.

iii.   "rib having opposed side edges and an outer edge between
said side edges."

This element is the primary focus of the parties' dispute.
Candy Treasure contends that the rib must have demarcated edges
or stiff edges, given the use of the term "side edges" and an
"outer edge."  In other words, because the '872 Patent uses such
terms, there must be a way of measuring the side and top edges,
which cannot be done on Candy Treasure's rib which is round.
Defendant's argument is not persuasive.  The plain meaning of
the term "edge" means that the edges may be straight or curved.
Moreover, the side edges can be differentiated from the outer
edge.  Indeed, Figures 2a and 4 of the '872 Patent show an
embodiment where the side edges are formed with protrusions
which serve to temporarily retain the edible layer over the
plastic housing:







Fig. 2A                           Fig. 4

(Pl.'s Mot. at 17); see also Col. 6, ll. 22-34.  The outer edge, however, is substantially flush with the edible layer.  Id. Moreover, the Patent is silent with respect to the rib having any one shape.[6]

    iv.   "a third and fourth section each formed of an edible material . . . lack of said [section] having a peripheral edge which substantially abuts one of said opposed side edges of said rib."

This element requires both edible sections to have peripheral edges that substantially abut one of the rib's side edges.  Defendant contends that its product does not substantially abut because the chocolate layers leave a gap around the Candy Treasure ridge:

_____

[6] The Court also notes that to the extent Defendant is relying on the lack of demarcation between the outer and side edges, the Choco Treasure product seems to contain such a demarcation at the point where the angle in the side edges changes and begins to curve inward. In other words, the side edges go straight up from the inedible housing but, at some point begin to curve inward. At that point, the outer edge begins.



(Def.'s Opp. at 6.)  In other words, because the chocolate layers do not touch something they do not substantially abut it. This argument is without merit. As Yowie points out, "abuts" does not require direct contact. See In re Lillich, 245 F.2d 471, 473 (C.C.P.A. 1957) ("abutting" cannot be construed as requiring that the sections "shall contact each other"). Moreover, even if there is a slight gap in the picture on which Candy Treasure relies to argue its chocolate layers do not substantially abut, that gap becomes even more slight or disappears once the chocolate is wrapped in foil.

In conclusion, based on the above analysis, the Court finds that Yowie is likely to succeed on its infringement claim.

### B. Irreparable Harm

"A mere showing that [Plaintiffs] might lose some insubstantial market share as a result of [Defendant's] infringement is not enough. As the Supreme Court has pointed out, a party seeking injunctive relief must make 'a clear showing' that it is at risk of irreparable harm . . . which entails showing 'a likelihood of substantial and immediate irreparable injury . . . .'" Apple, Inc. v. Samsung Elecs. Co., Ltd., 678 F.3d 1314 (Fed. Cir. 2012) (citations omitted)

(affirming district court's denial of preliminary injunction based on plaintiff's failure to establish irreparable harm).

In demonstrating irreparable injury, Plaintiffs must show a causal nexus between the alleged infringement and the alleged harm. Apple, Inc. v. Samsung Elecs. Co., Ltd., 678 F.3d 1314, 1324 (Fed. Cir. 2012). As the Federal Circuit has held,

> [s]ales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature. If the patented feature does not drive the demand for the product, sales would be lost even if the offending feature were absent from the accused product. Thus, a likelihood of irreparable harm cannot be shown if sales would be lost regardless of the infringing conduct.

Id.; see also Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 982 (9th Cir. 2011) ("In sum, Perfect 10 has not shown a sufficient causal connection between irreparable harm to Perfect 10's business and Google's operation of its search engine. Because Perfect 10 has failed to satisfy this necessary requirement for obtaining preliminary injunctive relief, the district court's ruling was not an abuse of discretion."). Moreover, "delay in bringing an infringement action and seeking a preliminary injunction are factors that could suggest that the patentee is not irreparably harmed by the infringement." Apple, Inc. v. Samsung Elecs. Co., Ltd., 678 F.3d 1314, 1325 (Fed. Cir. 2012) ("[I]t was reasonable for the district court to consider the issue of delay and to find that [plaintiff] had not

27

proceeded as quickly as it could have in seeking preliminary injunctive relief.").

Yowie and Whetstone argue that they will suffer irreparable harm because they are about to launch their surprise chocolates in the United States.  Because Candy Treasure is the only other competitor (infringing), Plaintiffs argue, Yowie is being deprived of customers who have gone with Candy Treasure and do not wish to carry a second identical product.  Yowie contends that Defendant "can keep selling nationally in a vacuum of competitors (other than Yowie) – a vacuum that Yowie is supposed to be enjoying based on its patent rights."[7]  (Docket 8-1 at 22.) National retailers already accustomed to Defendant's surprise chocolates are unlikely to carry another brand simultaneously. (Id. at 26.)  Moreover, they argue, because Candy Treasure claims that it is the only "legal" surprise chocolates in the United States, such false advertising by Defendant risks

---

[7] Yowie also contends that an injunction should issue solely on the basis that Candy Treasure is trespassing on Yowie's patent property rights.  However, this is not the law elsewise a preliminary injunction would always issue in patent infringement actions.  Cf. Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012) (noting, while courts should consider the nature of patent rights, a "patentee is not entitled to [a permanent] injunction in every case") (citing Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1149 (Fed. Cir. 2011); QBAS Co. v. C Walters Intercoastal Corp., No. 10-406, 2010 U.S. Dist. LEXIS 143945, at *32 (C.D. Cal. Dec. 16, 2010) ("Harm cannot be presumed based on patent infringement alone.").

branding Yowie's surprise chocolates as the illegal,
counterfeit, or "second class" product.  (Id. at 26-27.)  Candy
Treasure responds that all of the alleged harm, if any, is
actually compensable via money damages, particularly because
Yowie has not yet launched its product.

With respect to Yowie's latter claim, the evidence at the
hearing demonstrated that for an unknown period of time, Candy
Treasure had represented on its website that it was the only
"legal" supplier of chocolate surprise products in the United
States.  (See Tr. at 352; Pl.'s Ex. 28A-C.)  However, by the
time of the hearing, it appears Candy Treasure had removed this
advertisement from its webpage (and eventually, its mobile
page).[8]  Thus, because any harm is not a continuing harm, it
seems any claim related to this misleading representation by
Candy Treasure is adequately remedied by monetary damages.

With respect to the launch of its product, the testimony
established that, although hopeful, Yowie has not yet launched
its product, and any launch in the near future is a limited one.

### 1. Market Share

Although Yowie contends that it will suffer an irreversible
loss of market share, the evidence has not supported such

---

[8] Apparently, the misleading representation remained on the
mobile website for a longer period, but has also been taken off.
Yowie argues that it still remains on the URL heading, but this
argument is unpersuasive.

argument.  Yowie's efforts at launching its product have been, and still are, in progress.  At the time Yowie filed its Complaint and Motion for Preliminary Injunction in the Southern District of California, Yowie represented to the Court, through the Declaration of Wayne Loxton, Executive Chairman for Yowie Group Limited, that it intended to launch its product "this fall," and that the first shipments would arrive in the United States by early November 2013.  (Declaration of Wayne Loxton dated Oct. 4, 2013, Dkt. Ent. 8-3.)  Yet, fall has passed and Yowie has not yet launched its product.[9]  Moreover, as the testimony of both Loxton and Patricia Fields demonstrated, the anticipated launch is limited in scope and territory.  (See, e.g., Tr. at 33, 36-37.)  First, the hearing testimony demonstrated that Yowie intends to launch its product once it finalizes its contract with          .  However, that prospective contract, at this stage of the proceedings, will involve a sale of the Yowie product in a limited number of stores (approximately 50) in Texas.  (Id.)  Thus, there was no hearing testimony that Yowie intended to enter the market beyond

      ,[10] and at this stage, beyond the Texas area.  (Tr. at 61

---

[9] In fact, Yowie's has only managed to conduct a small test run at a convenience store in St. Augustine, Florida.  (See Tr. at 31, 90.)

[10] Loxton testified generally that Yowie would "ramp up capacity quickly to accommodate the other buyers," and the next plant facility upgrade permitting greater production capacity

("Q. . . .  You've testified, have you not, that you are now, or Yowie is now focused exclusively on              ?  A.  At this point, yes.  Q.  There are no current attempts to place the Yowie product at any other retailer?  A.  That is correct."); see also id. at 55, 61-62.)  Although Loxton testified that the contract with        was to contain a provision that allowed Yowie to sell its product outside         in the event that        could not sell all that Yowie manufactured, it is speculative at this juncture that Yowie would be able to sell its product beyond         (Id. at 55.)  First, there is not yet a signed contract between Yowie and        and the parameters of any exclusivity provision are unknown.  Second, it is unknown, even assuming a non-exclusivity provision, how much Yowie's production capacity will exceed         demand and therefore the amount of product available for sale to a third-party.  Third, Yowie has presented no evidence that it was denied a retailer opportunity because that retailer had contracted with Candy Treasure.  Indeed, Ms. Fields testified

_____

may occur within twelve months. However, he acknowledged that no hard dates on such upgrades are set, and that any future plans depend upon        needs, which are unknown at this juncture. (Tr. at 82-83; see also id. at 62 ("Q. Mr. Loxton, let me turn you back to your declaration. The end of paragraph 21, do you see of [sic] the sentence there, 'That would require a huge commitment on Yowie's part and we will want all our capacity available to meet        needs?' A. Correct. . . . We want to save the capacity to understand what demands are going to be . . . ."). )

that prospective retailers Yowie has contacted have never cited
the existence of Candy Treasure as a reason for rejecting the
Yowie product.[11]  (See Tr. at 146-47.)

   After the conclusion of the hearing, Yowie submitted a
supplemental declaration by Fields, which noted that         may
not to prepared to carry the Yowie product until the back-to-
school period beginning in August 2014.  (Declaration of
Patricia Fields dated April 28, 2014 at ¶ 3.)  Consequently,
Yowie is now attempting to secure contracts with other retailers
in an attempt to get its product into the market sooner.  (Id.
at ¶¶ 4-6.)  Again, at this juncture, Yowie's nascent attempts
to launch its product through other retailers render any harm
speculative at best, especially in light of the differences in
the products themselves.  (See infra.)

   Yowie also argues that it will lose the first-to-market
advantage and may never recover such market.  This Court

_____

   [11] There was some testimony presented regarding Yowie's
attempt to contract with        .  (Tr. at 103.)  According to
an email exchange between William Killeen, on behalf of Yowie,
and Brad Carlin, on behalf of       ,        was hesitant
"about the risk of bringing [Yowie] in" due to a prior
experience with Choco Treasure.  (Pl.'s Ex. 4 at Ex. 1.)
However,        concerns appear to relate only to an issue
with FDA clearance and not the existence or quality of the Choco
Treasure product. (See id. ("He was about to bring in Choco
Treasures when the FDA stopped them from shipping it so he has
somewhat of a bad taste in his mouth about it.").)  Indeed,
        queried whether or not Yowie could soothe
concerns by demonstrating FDA approval of the Yowie product.
(Id.)

disagrees.  First, as mentioned, Yowie anticipates signing a

contract with          that will require          to purchase and

sell all of Yowie's product.  Only if          does not, can

Yowie sell beyond          Such a scenario is speculative at

this juncture.  What the contract between          and Yowie will

provide remains to be seen.  Indeed, whether          will even

agree to such a provision or will insist on total exclusivity is

unclear.

　　　　Second, the marketing of the Yowie product is materially

different from that of Candy Treasure's.  As Ms. Fields

testimony showed, Yowie intends to market to children ages 7 to

14, and to promote its collectables with an environmental and

educational message.  (Tr. at 117-22, 126, 130-31, 171.)  The

chocolates and underlying capsules are shaped like one of six

Yowie characters that act as guardians of the natural world with

responsibility for a particular domain, such as the deserts and

plains.  (Tr. at 122, 149-50.)  Candy Treasure's product

packaging, on the other hand, is based upon famous licensed

characters, such as Spiderman and Hello Kitty, or sports balls,

as well as Christmas or Easter themes.  (See, e.g., DX-10; DX-

11; DX-17.)  The Yowie toy inclusions are of differing quality

and type than those included in the Choco Treasure product.[12]

_____

[12] Indeed, as Ms. Fields, non-executive director of Yowie,
testified, the quality of Candy Treasure's product is noticeably

(See Tr. at 149-53, 154-56 (describing endangered animals
included in some Yowie chocolates); id. at 281-82 (explaining
that Choco Treasure surprises consist of puzzles, stickers,
squirty toys, and decks of cards).)  The products also sell at
significantly different price points:      for Choco Treasure,
and      for Yowie.[13] (Id. at 98-99, 320.)

Importantly, Candy Treasure's products are sold seasonably,
primarily during Easter and Christmas.  (See id. at 284-85, 292,
293, 298-300, 356; DX-11; DX-40.)  Yowie, however, intends to
market its product year-round.  These companies target different
markets, different retailers, and different demographics among
consumers (age).  Moreover, there was no evidence that a
consumer would be compelled to patronize Target over      , or
vice versa.  In fact, the collectible nature of the Yowie
inclusions makes them unique such that a consumer may target
that product and patronize the store where it is sold - not the

_____

inferior, and will disappoint the customer who is not likely to
buy Candy Treasure's product again.  (See Tr. at 155-57.)
Moreover, unlike Candy Treasure's product, the Yowie product
will be marketed as gluten-free, trans fat-free, and nut-free.
(Id. at 156.)

[13] To the extent that Yowie argues that Choco Treasure's
lower price point and quality will lead to price erosion and
tarnish the market, the Court disagrees.  Yowie has been able to
convince      (which at some prior point sold Choco Treasure)
to sell the Yowie product at a much higher price based upon the
qualitative differences in the two items.  It is unclear to this
Court why consumers would not be similarly persuaded that a
better quality product justifies the price differential.

other way around.  Thus, given the significant differences between the parties' products, Yowie's arguments related to market entry barriers are unpersuasive.

Based on all the evidence presented, the Court finds that Yowie has not demonstrated evidence of irreparable harm in the form of incalculable damages or loss of market opportunities. On the record before it, any harm suffered by Yowie could be remedied by calculable money damages, e.g., disgorgement of profits by Candy Treasure.  Because the Court finds that Yowie has failed to demonstrate irreparable harm, it need not address Candy Treasure's arguments regarding causation.

As to Plaintiff Whetstone's assertion that he has been irreparably injured by the loss of a contract with Ferraro,[14] based upon the status of the discussions, it is pure speculation that any such contract would have been entered.[15]   Therefore,

---

[14] Tr. at 452 ("They [Ferrero] had offered to pay me a license, upfront license fee of $500,000 but they said we absolutely won't do it until you clear the Choco Treasure matter, you know, off the – clear them out of the way.  So, they were – they essentially irreparably harmed me from being able to enter into a deal with them because in order to get Choco Treasure out of the way I might have to go spend $800,000, you know, and go through the process.  . . .  Them being in the marketplace presented an obstacle to Ferrero coming into the U.S. with Kinder Surprise using my patents.").

[15] Yowie also engaged in unsuccessful licensing discussions with Ferrero in which Ferrero provided several reasons for rejecting any arrangement with Yowie (or Plaintiff Whetstone prior to that):

Plaintiff Whetstone has also failed to establish irreparable harm.

### C. Balancing the Hardships Between the Parties

In balancing the hardships to the parties, the Court finds that this factor is neutral, favoring neither party.  The Easter season has recently ended, and as the hearing testimony established, relatively insignificant sales of Candy Treasure's product occur from May to September.  (See, e.g., Tr. at 298.) In contrast, Yowie has not yet launched its product, and its contract with          is in limbo.  Although Plaintiff is most certainly correct that an infringer brings the injury upon itself when it makes the decision to market an infringing

_____

Your proposal, like that of Mr Whetstone before you, seems a bit pricy considering the residual life of [t]he patents, the apperent [sic] unsuccessful attempt by Mr Whetstone to put [t]hem to good use with his MeggaSurprise chocolate egg, the Candy Treasure permanent violation, the long time to market necessary to prepare a successful launch before the patents become publicly available.

As I mentioned to you, all we really wanted was the possibility to make some experimental use of the patents for chocolate eggs with toys.

See Pl.'s Ex. 17.  Candy Treasure's purportedly infringing activities are only one of the cited reasons.  Notably, Yowie's willingness to enter licensing arrangements with other entities such as Ferrero undercuts any argument that money damages will not suffice.  Cf. Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012); T.J. Smith & Nephew Ltd. v. Consolid. Medical Equip., Inc., 821 F.2d 646, 648 (Fed. Cir. 1987).

product, the Court finds that such infringing conduct can be addressed by an award of monetary damages.

### D. Public Interest

In light of this Court's finding that Yowie is likely to succeed on the merits of its patent infringement claim, the public interest factor favors Yowie.  This is because there is a strong public policy favoring the enforcement of patent rights. See PPG Indus. v. Garden Indus. Corp., 75 F.3d 1558, 1567 (Fed. Cir. 1996).

## III.   CONCLUSION

Based on an analysis of all of the four factors set forth above, Plaintiffs' request for a preliminary injunction is DENIED.

s/Renée Marie Bumb

RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

Dated:  May 8, 2014